UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division


DR. ARCHIE EARL, et al.,

      Plaintiffs,

v.                             Civil No. 2:13cv148

NORFOLK STATE UNIVERSITY, et al.,

      Defendants.


## OPINION AND ORDER

This matter is before the Court on a motion for summary judgment filed collectively by Norfolk State University ("NSU"), Dr. Tony Atwater—former President of NSU, the Board of Visitors of Norfolk State University, and the Commonwealth of Virginia (collectively, "Defendants"). ECF Nos. 75, 76. Counsel for lead Plaintiff, Dr. Archie Earl ("Dr. Earl"), who also represents the six additional named plaintiffs in this case (collectively, "Plaintiffs"), filed a joint response opposing summary judgment. ECF No. 85. Defendants thereafter filed a timely reply brief.[1] ECF No. 86.

---

[1] The Court notes at the outset that oral argument was not conducted in this case due in part to the compressed timeframe resulting from the impending trial date, as the summary judgment motion, which required analysis of seven different plaintiff professors working in four different departments at NSU, was not ripe until seven business days prior to trial. Had this Court not entered an expedited briefing order there would have been even less time prior to trial to address

## I. FACTUAL AND PROCEDURAL HISTORY

The factual and procedural history of the instant action are well-documented, and the Court incorporates herein the background set forth in prior Orders in this case. ECF Nos. 21, 33, and 42. In sum, lead plaintiff Dr. Earl, a long-time associate professor at NSU, filed the instant action asserting that Earl and other male professors were discriminated against based on their race, sex, and age. Earl further alleged retaliation against him based on his efforts to lead the fight against salary inequities at NSU. Pursuant to this Court's Opinion and Order dated June 26, 2014, the only claim in Plaintiffs' second amended complaint that survived the Defendants' motion to dismiss was the Equal Pay Act ("EPA") claim, alleging that Earl, and other male professors, were paid unequal wages for performing substantially the same jobs, under similar working conditions, as female professors. ECF No. 33.

The Court thereafter granted, in part, Dr. Earl's motion for conditional class certification, ECF No. 42, and ten additional male plaintiff professors opted into the class. ECF Nos. 57, 59. Pursuant to a consent order of dismissal dated

---

the motion. ECF No. 81. As reflected in the record, it appears that Plaintiffs' handling of discovery in this case may have contributed to delays in the filing of the summary judgment motion. ECF Nos. 63-65, 68, 70. Ruling on summary judgment without a hearing is permitted by the governing rules of Civil Procedure. Fed. R. Civ. P. 78(b); E.D. Va. Loc. Civ. R. 7(J).

February 5, 2016, three named plaintiffs were dismissed from the action.  ECF No. 70.  A second consent order of dismissal was granted approximately one week later, and an additional named plaintiff was dismissed.  ECF No. 71.  The remaining seven plaintiff professors are part of four different departments at NSU: (1) the Mathematics Department—Dr. Archie Earl, Dr. Boyd Coan and Dr. Curtiss Wall; (2) the Technology Department—Dr. Walter T. Golembiewski and Dr. Chijioke Akamiro; (3) the Political Science Department—Dr. Aberra Meshesha; and (4) the Sociology Department—Dr. William Agyei.

Defendants' summary judgment motion seeks judgment as to the claims of all seven remaining Plaintiffs.  Defendants assert that each Plaintiff's claim fails either because: (1) such Plaintiff does not set forth a <u>prima facie</u> case as he fails to identify a valid female "comparator" that is being paid more for performing work that is "substantially equal in skill, effort, and responsibility under similar working conditions"; or (2) "even if a <u>prima facie</u> case were established, [Defendants] sufficiently demonstrated that the salary differential was justified by gender-neutral factors," <u>Strag v. Bd. of Trustees, Craven Cmty. Coll.</u>, 55 F.3d 943, 948, 950 (4th Cir. 1995). Consistent with this Court's prior ruling, ECF No. 42, at 20, the relevant "comparator" analysis is addressed herein on a department by department basis because "different departments in

3

universities require distinctive skills," and such fact generally forecloses "any definitive comparison for purposes of the Equal Pay Act," Strag, 55 F.3d at 950.

## II. STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide that a district court "shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A fact is "material" if it "might affect the outcome of the suit," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A party opposing a summary judgment motion "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

Rule 56(c) addresses the applicable procedure for pursuing, and defending against, summary judgment, explaining as follows:

4

(c) **Procedures.**
  (1) *Supporting Factual Positions*. A party asserting
    that a fact cannot be or is genuinely disputed <u>must
    support the assertion by</u>:
      **(A)** citing to particular parts of materials in
      the record, including depositions, documents,
      electronically stored information, affidavits or
      declarations, stipulations (including those made
      for purposes of the motion only), admissions,
      interrogatory answers, or other materials; or
      **(B)** showing that the materials cited do not
      establish the absence or presence of a genuine
      dispute, or that an adverse party cannot produce
      admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(emphasis added). Rule 56 further states

that "[i]f a party fails to properly support an assertion of

fact or fails to properly address another party's assertion of

fact as required by Rule 56(c)," the Court has discretion to

"consider the fact undisputed for purposes of the motion." Fed.

R. Civ. P. 56(e).

Although the initial burden on summary judgment obviously

falls on the moving party, once a movant advances evidence

supporting summary judgment, the non-moving party <u>may not rest

upon the mere allegations of the pleadings</u>, but instead must

generally set forth specific facts, supported by documents,

affidavits, or other record materials illustrating a genuine

issue for trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24

(1986); <u>Butler v. Drive Auto. Indus. of Am., Inc.</u>, 793 F.3d 404,

408 (4th Cir. 2015). In other words, while the movant must

carry the burden to show the absence of a genuine issue of

material fact, when such burden is met, it is up to the non-movant to establish the existence of such an issue.  Celotex, 477 U.S. at 322-23.  At that point, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.  In doing so, the judge must construe the facts and all "justifiable inferences" in the light most favorable to the non-moving party, and the judge may not make credibility determinations.  Id. at 255; Reyazuddin v. Montgomery Cty., 789 F.3d 407, 413 (4th Cir. 2015).

In addition to the above, this Court's Local Rules include a rule devoted to summary judgment practice, which includes a provision requiring the moving party to set forth "a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue," as well as citations to the record to support such facts.  E.D. Va. Loc. Civ. R. 56(B).  The local rule further provides that a responsive brief should include a similar "specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue," as well as citations to the record.  Id.  The local rule expressly permits the Court to assume the truth of any facts identified by the moving party as undisputed that are not expressly controverted by the opposing party.  Id.

6

### III. DISCUSSION

Defendants have presented a summary judgment brief supported by citations to the evidentiary record including depositions, affidavits, and internal NSU business records. Plaintiffs oppose summary judgment as to four of the seven remaining Plaintiffs, but somewhat surprisingly, after complete discovery in a case that has been pending for multiple years, Plaintiffs' opposition includes no clear statement of disputed facts and very limited evidence. For the reasons discussed below, summary judgment is **GRANTED** in favor of Defendants as to the claims advanced by Plaintiffs Dr. Wall (Mathematics), Dr. Golembiewski and Dr. Akamiro (Technology), and Dr. Meshesha (Political Science). As to the remaining Plaintiffs, Dr. Earl and Dr. Coan (Mathemtatics), and Dr. Agyei (Sociology), viewing the evidence in a light most favorable to Plaintiffs, summary judgment is **DENIED**. While Defendants may have a meritorious argument either at the prima facie stage and/or the affirmative defense stage as to one or more of these three remaining Plaintiffs, based on the current record, such matters are issues properly left to the factfinder.

### A. Equal Pay Act Standard

The Equal Pay Act provides as follows:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed,

> between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment <u>for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions</u>, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: <u>Provided</u>, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1) (first emphasis added).  Interpreting and applying such statute, our court of appeals—the Fourth Circuit—has held:

> [I]n order to establish a <u>prima facie</u> case under the Equal Pay Act, the plaintiff bears the burden of showing that []he (1) receives lower pay than a [fe]male co-employee (2) for performing work substantially equal in skill, effort, and responsibility under similar working conditions. The comparison must be made "factor by factor with the [fe]male comparator." <u>Houck v. Virginia Polytechnic Institute</u>, 10 F.3d 204, 206 (4th Cir. 1993). Additionally, the plaintiff must identify a particular [fe]male "comparator" for purposes of the inquiry, and may not compare h[im]self to a hypothetical or "composite" [fe]male. <u>Id.</u>

<u>Strag</u>, 55 F.3d at 948.  If a plaintiff is successful in demonstrating a <u>prima facie</u> case, the burden shifts to his employer "to prove by a preponderance of evidence, that the pay differential is justified by the existence of one of the four statutory exceptions set forth in § 206(d)(1): (1) a seniority system, (2) a merit system, (3) a system that measures earnings

8

by quantity or quality of production, or (4) a differential based on any factor other than sex." Id. (citing Houck, 10 F.3d at 207). If the employer satisfies such burden, the plaintiff's claim fails "unless the plaintiff can satisfactorily rebut the defendant's evidence." Id.

While such burden shifting scheme is in some ways similar to that applicable to Title VII discrimination claims, it differs in an important respect. Notably, for an EPA claim, a prima facie case operates to shift "[t]he burden of production and persuasion . . . to the defendant 'to show, by a preponderance of the evidence, that the wage differential resulted from one of the allowable causes enumerated by the statute." Brinkley-Obu v. Hughes Training, Inc., 36 F.3d 336, 344 (4th Cir. 1994) (quoting Fowler v. Land Management Groupe, 978 F.2d 158, 161 (4th Cir. 1992)); see King v. Acosta Sales & Mktg., Inc., 678 F.3d 470, 474 (7th Cir. 2012) (citing Corning Glass Works v. Brennan, 417 U.S. 188, 204, (1974)). In contrast, for a Title VII claim, a prima facie case serves to shift only the burden of production to the defendant to advance a non-discriminatory justification for its acts, with "the burden of persuasion remain[ing] on the plaintiff to demonstrate that the proffered explanation is pretextual and that the

defendant was actually motivated by discriminatory intent."[2] Brinkley-Obu, 36 F.3d at 344 (citation omitted). While the burden that is shifted to Defendants in an EPA case is proof by "a preponderance of the evidence," likely because such burden is one of persuasion and not just production, it has been described by the Fourth Circuit as a "heavy" burden. Brewster v. Barnes, 788 F.2d 985, 992 (4th Cir. 1986); cf. Steger v. Gen. Elec. Co., 318 F.3d 1066, 1078 (11th Cir. 2003) ("The burden to prove these affirmative defenses is heavy and must demonstrate that the factor of sex provided no basis for the wage differential.") (internal quotation marks and citation omitted). In order to carry such burden on summary judgment, a defendant must present sufficient evidence such that "the court can conclude that had the same evidence been presented and remained uncontested at trial, [the defendant] would be entitled to a directed verdict. Brinkley v. Harbour Recreation Club, 180 F.3d 598, 614 (4th Cir. 1999) (overruled on other grounds). As indicated above, if such burden is carried, the plaintiff, of course, has the opportunity to rebut the defendant's evidence. Strag, 55 F.3d at 948.

## B. Analysis - Technology Department

Plaintiffs Dr. Golembiewski and Dr. Akamiro both assert that they suffered salary discrimination under the Equal Pay Act

---

[2] Unlike Title VII claims, discriminatory intent need not be proven to establish an EPA claim. Brewster v. Barnes, 788 F.2d 985, 993 n.13 (4th Cir. 1986) (citations omitted).

and point to Dr. Eleanor Hoy as the only female "comparator" who was working in their department and paid a greater salary. Defendants' summary judgment motion asserts that Dr. Hoy does not perform substantially equal duties with substantially equal responsibilities as compared to Drs. Golembiewski and Akamiro because, unlike Plaintiffs, she is not a full-time professor at NSU.   Rather, prior to 2011, Dr. Hoy was only a part time adjunct professor, and although she was appointed to a full-time position in 2011, it was not a full-time professorship, but was instead an administrative position as "Special Assistant to the Dean" and "Director of Retention" within the College of Science, Engineering and Technology.   Dr. Hoy's salary was later increased when she was elevated to the university-wide administrative position of "Retention Czar."   Defendants support such factual claims with several internal NSU documents associated with Dr. Hoy's employment.   ECF No 75-4 at 6-11. Such facts are further supported by the sworn affidavit of Sandra J. Deloatch, the NSU "Provost and Vice President of Academic Affairs."   Deloatch Aff. ¶¶ 2, 22, ECF No. 75-1.

Plaintiffs' brief in opposition to summary judgment <u>does not dispute any of the Defendants' evidentiary</u> submissions or statement of undisputed facts, which on their face establish that Dr. Hoy's position at NSU involved job performance that was <u>not</u> substantially equal in effort or responsibility to

Plaintiffs Golembiewski and Akamiro. Furthermore, Plaintiffs fail to advance a counter-statement of facts and/or any evidence in conflict with Defendants' facts. To the contrary, Plaintiffs' summary judgement brief does not even include an argument section devoted to the claims advanced by Dr. Golembiewski and Dr. Akamiro, clearly signaling Plaintiffs' view that, on these facts, entry of summary judgment is appropriate as to this issue.

Based on the undisputed facts advanced by Defendants, Dr. Hoy is plainly not a valid comparator, and Plaintiffs have failed to point to any other evidence that could support a prima facie EPA claim. Accordingly, summary judgment is **GRANTED** in favor of Defendants as to the EPA claims advanced by Drs. Golembiewski and Akamiro because Plaintiffs fail at the prima facie stage of the EPA burden shifting analysis.

### C. Analysis - Mathematics Department: Dr. Wall

Plaintiff Dr. Curtiss Wall, a former NSU professor in the Mathematics Department (retired), advances an Equal Pay Act claim. However, he does not dispute the fact that, during the relevant timeframe, his salary was greater than all of the female professors in the Mathematics Department. Having made such concession, Dr. Wall attempts to rely on three female comparators that teach at NSU in two different departments: Engineering and Computer Science.

12

### 1. Prima facie case

As recognized in the Court's prior Opinion and Order issued in this case, ECF No. 33, and as demonstrated by Fourth Circuit precedent, rare would be the case where a university professor can demonstrate that a professor from a different department is a valid EPA comparator because "different departments in universities require distinctive skills that foreclose any definitive comparison for purposes of the Equal Pay Act." Strag, 55 F.3d at 950; ECF No. 42, at 20. Here, Defendants advance undisputed facts, supported by affidavits, indicating that all three of Dr. Wall's identified comparators are not appropriate EPA comparators because their work is not substantially equal in skill. Specifically, the purported comparators have PhDs in Computer Science (Dr. Humphries & Dr. Rivzi) or Engineering (Dr. Morsi) as contrasted with Dr. Wall's PhD in Mathematics Education. Deloatch Aff. ¶ 21. Additionally, Dr. Morsi has a certification to teach computer science, and Dr. Wall does not. Schexnider Aff. ¶ 23, ECF No. 75-2. Because Dr. Wall has "no earned graduate credits in Engineering or Computer Science," he is "not qualified to teach undergraduate courses in those disciplines per the requirements of NSU's regional accreditor." Deloatch Aff. ¶ 21.

Notwithstanding Defendants' presentation of evidence indicating that the skills required for Dr. Wall's position

differ from that of the three comparators, Plaintiffs'
responsive filing and attached exhibits do not: (1) dispute such
facts; (2) present any conflicting facts; or (3) address such
issue through argument contained in their brief. Rather,
similar to the Technology Department claims, Plaintiffs no not
provide any opposition to summary judgment on this issue.
Accordingly, summary judgment is **GRANTED** in favor of Defendants
as to the EPA claim advanced by Dr. Wall because his claim fails
at the prima facie stage of the EPA burden shifting analysis.

### 2. Affirmative Defense

Alternatively, even if the Court assumes that a prima facie
case were made by Dr. Wall, Defendants offer undisputed
affidavit evidence demonstrating that any salary differential
between Dr. Wall and the comparators he identifies is justified
by gender-neutral factors. Specifically, Defendants' evidence
establishes that both "market demands" and "academia and the
public view" place a higher value on Engineering and Computer
Science than they do on Mathematics. Deloatch ¶ 21. Plaintiffs
offer nothing to refute the accuracy of such sworn statements.
Accordingly, Defendants' undisputed facts are accepted by the
Court, and the Court alternatively finds that even if Dr. Wall
identified a valid comparator from outside his department: (1)
Defendants have established a gender-neutral factor justifying
the identified salary differential; and (2) Plaintiffs have

failed to rebut such evidence and offer no opposition to summary judgment on this issue.  Summary Judgment is therefore alternatively **GRANTED** in favor of Defendants as to Dr. Wall's EPA claim because Defendants have carried their burden of persuasion to establish an affirmative defense.

### D. Analysis - Political Science Department

Plaintiff Dr. Meshesha asserts that he suffered salary discrimination under the Equal Pay Act and points to Dr. Barnes as the female "comparator" within his department who was paid a greater salary.  Defendants assert that Dr. Barnes is not a viable comparator based on the prior "valuable experience" she brought to the faculty when she returned to teaching in 2009 after having served as an NSU Dean and Vice President for Academic Affairs.  Alternatively, Defendants assert that even if Dr. Barnes is a valid comparator, her prior administrative experience serves as a gender-neutral basis justifying the salary differential with Dr. Meshesha.  It should be noted that Defendants' claim on summary judgment is not in any way based on any perceived shortcomings in Dr. Meshesha's qualifications or performance.  As set forth below, Summary Judgement is granted in favor of Defendants at to this claim.

### 1. Prima facie case

The Court agrees with Plaintiffs that, considering the record in a light most favorable to Plaintiffs, Defendants fail

to demonstrate on summary judgment that Dr. Meshesha has
identified an improper comparator.   Specifically, Defendants
neither offer their own facts, nor demonstrate that there is an
absence of evidence establishing that Dr. Meshesha, a tenured
full-professor with a PhD in Public Administration, does not
perform work requiring substantially equal skills, efforts, and
responsibility, under similar working conditions, as Dr. Barnes,
a professor in the same department with a PhD in Arts in
Government.   While Defendants assert that Dr. Barnes brings
additional skills to the equation that are highly valued by NSU
and not possessed by Dr. Meshesha, on this record, such
additional skills are not properly considered as part of the
prima facie analysis because there are no facts suggesting that
such skills are required for the position that Dr. Barnes holds
at NSU.   See 29 C.F.R. § 1620.15(a) (indicating that the "skill"
required to perform a job "must be measured in terms of the
performance requirements of the job" and that "possession of a
skill not needed to meet the requirements of the job cannot be
considered in making a determination regarding equality of
skill"); Lovell v. BBNT Sols., LLC, 295 F. Supp. 2d 611, 622
(E.D. Va. 2003) (explaining that, at the prima facie stage, the
relevant comparison is "a comparison of the skills required by
the job, not a comparison of the skills possessed by individual

employees") (emphasis added).[3] Such skill differences between individuals are, however, unquestionably relevant at the second stage of the analysis after the burden has shifted to Defendants because "[a] difference in the skills of individual employees can . . . justify unequal wages under the catchall statutory exception for wage differentials based on 'any factor other than sex.'" Lovell, 295 F. Supp. at 622 n.11; see Cullen v. Indiana Univ. Bd. of Trustees, 338 F.3d 693, 699 n.2 (7th Cir. 2003) ("The actual differences between educational pedigree are relevant in the affirmative defense of proving a pay differential based on 'any factor other than sex.'").

### 2. Affirmative Defense

When a plaintiff sets forth a prima facie EPA claim "[t]he burden of production and persuasion then shift to the defendant 'to show, by a preponderance of the evidence, that the wage

---

[3] While Plaintiffs have not advanced evidence individually addressing the similarity in skill, effort, and responsibility required to perform the jobs held by Dr. Barnes and Dr. Meshesha, the nature of Defendants' summary judgment motion does call into question Plaintiffs ability to do so. Rather, Defendants' motion focuses solely on the claim that Dr. Barnes' valuable administrative experience makes her an improper comparator (a claim this Court rejects). Because Defendants have not effectively challenged the substantial equality of the two jobs in any other respect, Plaintiff Meshesha was not obligated to present affirmative evidence on summary judgment to demonstrate his ability to prove a prima facie case. Cf. 10A Fed. Prac. & Proc. Civ. § 2727 (3d ed.) ("[A]t least in cases in which the nonmoving party will bear the burden of proof at trial, the movant can seek summary judgment by establishing that the opposing party has insufficient evidence to prevail as a matter of law, thereby forcing the opposing party to come forward with some evidence or risk having judgment entered against him.") (emphasis added).

differential resulted from one of the allowable causes enumerated by the statute." Brinkley-Obu, 36 F.3d at 344 (quoting Fowler, 978 F.2d at 161). Here, relying on the statutory defense "any factor other than sex," Defendants assert that Dr. Barnes is paid a higher salary than Dr. Meshesha as a result of her former experience as Dean and Vice President at NSU. As stated in a sworn affidavit submitted by NSU's current Provost and Vice President of Academic Affairs, Dr. Barnes' experience as a former high-ranking administrator at NSU brings "NSU institutional knowledge, personal alumni contacts, and a thorough historic perspective on NSU's mission that is highly valued by University Administration." Deloatch Aff. ¶ 25. A sworn affidavit submitted by Defendants' expert repeats such point, and further opines, under oath, that such elevated pay is "not uncommon when former academic administrators return to a full-time faculty position" and is "a generally accepted practice in higher education." Schexnider Aff. ¶ 30. Further supporting such sworn statements, Defendants point to a provision in the NSU "Teaching Faculty Handbook" expressly addressing "salary conversion" when former administrators rejoin the NSU teaching faculty. ECF No. 75-10, at 92-93. Such provision acknowledges that, in "special instances," the salary level of a former administrator "will be set by the President based upon the academic administrator's experience,

qualifications, service to the University, and other relevant factors." Id. at 93.

Further supporting the above evidence, Defendants submit an excerpt from Dr. Meshesha's deposition. During such deposition, defense counsel was questioning Dr. Meshesha about former male administrators being paid higher salaries when they returned to teaching at NSU and Plaintiffs' counsel made the following stipulation:

> **Pl. Counsel:** Let me interject something here. We will stipulate that there are many instances and on this very campus where this has happened and will probably continue to happen. That doesn't mean it is right or that we approve of it or that Dr. Meshesha approves of it.

> **Def. counsel:** Well, thank you for your stipulation.

> **Def. counsel Question:** Are there many examples in which the returning person was male as well as examples where the returning person was female?

> **Pl. counsel:** Probably.

> **Def. counsel:** Well, I need a yes or no.

> **Pl. counsel:** I'm sorry, I shouldn't be answering.

> **Def. counsel:** Is that your stipulation or is it not?

> **Pl. counsel:** Oh, yes. We stipulate that this has occurred many times.

> **Def. counsel:** With males?

> **Pl. counsel:** Without regard to gender.

> **Def. counsel:** Okay, Thank you.

Meshesha Depo. at 21-22, ECF No. 75-3.

All of the above evidence, including sworn testimony of a current high-ranking NSU official, sworn testimony of Defendants' expert, and Dr. Meshesha's stipulation that NSU engaged in such practice <u>without regard to gender</u>, if uncontroverted at trial, would support a directed verdict in favor of Defendants as to their affirmative defense because there are no material factual disputes, and no direct <u>or</u> <u>circumstantial</u> evidence of any kind in the record undercutting in any way such gender-neutral explanation. Accordingly, Dr. Meshesha's claim fails at the summary judgment stage unless he comes forward with some evidence rebutting Defendants' case. <u>Strag</u>, 55 F.3d at 948.

A review of Plaintiffs' submission in opposition to summary judgment reveals that: (1) Dr. Meshesha offers no challenge to Defendants' statement of undisputed facts as related to this issue (such facts are therefore accepted as true); and (2) Dr. Meshesha offers no evidence to rebut Defendants' showing, either directly or through justifiable inferences. Dr. Meshesha does not submit any deposition testimony, affidavits from himself, fact witnesses, or expert witnesses, nor does he submit any other document calling into question the sworn statements advanced by Defendants.[4] Rather, Plaintiffs' brief in opposition

---

[4] After conducting full discovery, and after stipulating that NSU provides enhanced salaries to <u>male and female</u> administrators without

to summary judgment on this issue relies exclusively on the submission of Dr. Meshesha's resume.[5]

While Dr. Meshesha submits a resume in an effort to demonstrate that he is a well-qualified professor, such undisputed fact is not material to the issue before the Court because: (1) as previously stated, Defendants' affirmative defense does not rely in any way on a negative characterization of Dr. Meshesha's qualifications or performance; (2) Dr. Meshesha's resume does not report any experience as a Dean, Vice-President, or other high-ranking administrator at NSU (or at any other university); and (3) Dr. Meshesha's resume does not report any professional activities or accomplishments from the last twenty years, with the latest date appearing on such document being 1996. ECF No. 85-11. Accordingly, in light of the unchallenged statements of fact, and evidence, presented by Defendants, and the stipulation entered into by Plaintiffs'

---

regard to sex, Plaintiffs have not endeavored to present any evidence or argument suggesting that Dr. Barnes receives any more than the "typical" increase in pay that is afforded to a former administrator.

[5] As highlighted in Defendants' reply brief, such resume is not accompanied by an affidavit from Dr. Meshesha, nor does the resume itself include a sworn attestation that the contents therein are true, accurate, and complete. However, because Defendants do not "object" to such document as containing facts that could not be produced at trial in admissible form, the Court considers its contents. Williams v. Silver Spring Volunteer Fire Dep't, 86 F. Supp. 3d 398, 407 (D. Md. 2015); Fed. R. Civ. P. 56(c).

counsel,[6] Dr. Meshesha's facially outdated resume fails to "satisfactorily rebut [Defendants'] evidence." Strag, 55 F.3d at 948. Stated differently, assuming that Plaintiffs' rebuttal evidence at trial relied solely on the resume indicating no experience as a high-ranking university administrator, and in fact, no professional accomplishments of any kind in the last two decades, no reasonable juror could find in favor of Dr. Meshesha. Because Plaintiffs' limited rebuttal efforts fall significantly short of the level necessary to either call Defendants' affirmative defense into question or to otherwise demonstrate the existence of genuine disputes as to material facts, summary judgment is **GRANTED** in favor of Defendants as to Dr. Meshesha's EPA claim.

### E. Analysis - Sociology Department

Plaintiff Dr. Agyei asserts that he suffered salary discrimination under the Equal Pay Act and points to Dr. Holmes as the female "comparator" within his department who was paid a greater salary. Defendants assert that Dr. Holmes is not a viable "comparator" because, in addition to her teaching duties, she was serving as the Director of the Masters Program in

---

[6] A careful reading of both the stipulation and Plaintiffs' brief in opposition to summary judgment suggest that Dr. Meshesha's true contention is not that he is being treated differently based on his sex, but that it is unfair for any former administrator, of any sex, to be paid a substantially elevated salary when acting solely as a professor. Whether such complaint is legitimate or not, it has no place in the EPA analysis.

Criminal Justice, a position that: (1) is paid on a 12-month calendar year, rather than the 9-month calendar year generally applicable to NSU professors; and (2) involves additional duties and responsibilities different from those required of Dr. Agyei, a tenured Sociology professor. Separately, Defendants assert that even if a proper comparator, Dr. Holmes' additional duties provide a gender-neutral justification for her increased pay. After reviewing the briefs and record, the Court finds that summary judgment is not appropriate at this time as to either of the arguments advanced by Defendants.

## 1. Prima Facie Case

It is undisputed that Dr. Holmes was the Director of NSU's Masters Program in Criminal Justice during much of the time relevant to the instant litigation. Based on the record before the Court, it is clear that, during such timeframe, Dr. Holmes' salary was elevated to compensate her for her Directorship duties, which the record clearly establishes are additional job responsibilities dissimilar to the responsibilities of Dr. Agyei. At first blush, such dissimilar job duties appear to render Dr. Holmes an improper comparator as argued by Defendants. However, a more careful review of the record reveals that, at least at this stage in the proceedings, the manner in which Dr. Holmes' salary was calculated by NSU does not exclude her as a comparator to Dr. Agyei.

When viewed in a light most favorable to Plaintiffs, the NSU business records submitted by Defendants suggest that Dr. Holmes' total compensation was determined by paying her a base salary that was then increased by an "administrative premium," with such premium being expressly tied to her service as the "Director of the Masters Program in Criminal Justice." ECF No. 75-7, at 40. Moreover, such records indicate that if Dr. Holmes stopped acting as Director, she would revert to her base salary. Id. Because Dr. Holmes' base salary is more than Dr. Agyei's salary, and because Defendants, as the moving party, fail to assert that Dr. Holmes' base duties and responsibilities as a full professor in the Sociology department are not substantially similar to Dr. Agyei's duties as a full professor in the same department, the evidence viewed in Plaintiffs' favor appears sufficient for a factfinder to conclude that Dr. Holmes is a valid comparator notwithstanding her role as Director of the Masters Program. Cf. Wheatley v. Wicomico Cty., Maryland, 390 F.3d 328, 334 (4th Cir. 2004) (indicating that a plaintiff's claim does not falter merely because such plaintiff "fail[s] to identify one specific individual who constitutes a perfect [fe]male comparator" because the "text of the EPA may not be brushed with such a demanding gloss") (emphasis added); Brewster, 788 F.2d at 991 ("The crucial finding on the equal work issue is whether the jobs to be compared have a 'common

core' of tasks, i.e., whether a significant portion of the two jobs is identical. The inquiry then turns to whether the differing or additional tasks make the work substantially different.") (quotation marks and citation omitted).

The Court acknowledges that Plaintiffs' limited evidentiary submission on summary judgment does not advance facts making a specific comparison between the skills, efforts, and responsibilities of Dr. Agyei's and Dr. Holmes' core set of job functions. However, as previously discussed herein in footnote three, Defendants' summary judgment motion does not call this matter into question such that Dr. Agyei was obligated to provide responsive evidence to survive summary judgment. Rather, because Defendants' summary judgment motion focuses solely on distinguishing Dr. Holmes' added duties involved in being the Director of the Masters program, and the current record, viewed in Plaintiffs' favor, suggests that such added duties are fully and separately compensated through an "administrative premium," Defendants do not "affirmatively offer evidence which undermines one or more of the essential elements of the plaintiff's case" nor do they "demonstrate that the evidence in the record falls short of establishing an essential element of the plaintiff[s'] [prima facie] case." Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264 (5th Cir. 1991) (citing Celotex, 477 U.S. 317); see 10A Fed. Prac. &

Proc. Civ. § 2727 (3d ed.). Defendants therefore fail to effectively demonstrate that Dr. Holmes cannot be utilized as a valid comparator to Dr. Agyei. Cf. Lovell, 295 F. Supp. 2d at 618, 620-21 (indicating that, in EPA cases: (1) the inquiry does not turn on "titles, descriptions, or classifications, but rather on the actual requirements, performance, and content of the jobs being compared;" (2) that the comparison requires analysis of the "common core of tasks in their jobs"; and (3) that distinctions such as "full-time" or "part-time" (facially similar to a distinction between a 9-month work calendar and a 12-month work calendar) do not categorically preclude an effective comparison between the plaintiff and the chosen comparator).

## 2. Affirmative Defense

Similar to the prima facie analysis, viewing the record in Plaintiffs' favor, the Court finds that Defendants fail at this time to demonstrate a valid gender-neutral basis for the disparity in pay between Dr. Agyei and Dr. Holmes. As indicated above, Defendants' justification for the pay disparity rests solely on Dr. Holmes' Directorship, and while such defense clearly involves a valid factor other than gender, the record evidence, viewed in Plaintiffs' favor, supports an interpretation that the "administrative premium" associated with the directorship explains only a portion of the total pay

26

disparity. Therefore, Defendants' affirmative defense, at least on this record, would not support a directed verdict in Defendants' favor. Alternatively, even if Defendants' evidence is viewed as sufficient to establish a valid gender-neutral affirmative defense, the Court finds that such defense is rebutted by record evidence demonstrating that Dr. Holmes' "rate" of pay exceeds Dr. Agyei's rate of pay by an amount greater than that which can be attributed to her directorship.[7] Accordingly, Defendants' summary judgment motion is **DENIED** as to Dr. Agyei's claim.

---

[7] In addition to the evidence discussed above, the Court notes that record evidence, submitted primarily by Defendants, provides further support for Dr. Agyei's claim that there was a salary differential between himself and Dr. Holmes that is not attributable to her directorship. First, the record appears to indicate that Dr. Holmes was initially hired in 2002 to perform a typical 9-month schedule as a "tenure track" NSU professor at an annual salary of $67,000. ECF No. 75-7. According to Defendants' expert, Dr. Agyei was paid less ($60,000) during the subsequent academic year even though he was the Sociology Department Chair at that time and his salary included a $10,000 premium for acting as Chair. Schexnider Aff. ¶ 32. Second, the record appears to indicate that during the 2012-2013 academic year, Dr. Agyei, would have been entitled to a salary of approximately $66,000, Schexnider Aff. ¶ 32, which is still less than Dr. Holmes' salary at the time of her hire ten years earlier, and far less than her "base" salary at that time. Finally, Plaintiffs' unredacted salary chart, ECF No. 93-1, considered in conjunction with deposition testimony submitted by Defendants, appears to demonstrate that Dr. Holmes ceased acting as the Director of the Masters program in 2015, and although her salary was reduced, she continued to receive a salary more than $15,000 greater than Dr. Agyei. These facts, viewed in Plaintiffs' favor, further support Dr. Agyei's contention that, irrespective of her Directorship, Dr. Holmes, a female full professor in the Sociology department, was being paid more than Dr. Agyei, a male full professor in the same department. While Defendants may have a valid gender-neutral explanation for such disparity, it has not been presented to this Court on summary judgment.

### F. Analysis - Mathematics Department: Drs. Earl & Coan

Plaintiffs Dr. Earl and Dr. Coan both assert that they suffered salary discrimination under the Equal Pay Act. Dr. Earl points to Drs. Cotwright-Williams, Ellis, Fernando, Lanz, Barber and Verma as comparators. Dr. Coan points only to Drs. Lanz and Verma as his comparators. Defendants' summary judgment motion does not seriously question whether the named comparators are performing work "substantially equal in skill, effort, and responsibility under similar working conditions" as Drs. Earl and Coan.[8] Strag, 55 F.3d at 948. This Court therefore begins its analysis with Defendants' presentation of an affirmative defense asserting that factors "other than sex" caused the pay disparities at issue. The Court notes at the outset that Defendants argument is multi-faceted, and includes factual assertions intended to highlight the qualifications of the female comparators and intended to call into question Dr. Earl and Dr. Coan's qualifications and/or performance in an effort to characterize their diminished "value" to NSU. Although a very

---

[8] Defendants suggest in a footnote that Dr. Earl's purported "skill gaps," to include his failure to have a terminal degree in his field, justify rejecting a salary comparison with the comparators he has identified. Defendants, however, fail to cite any legal authority supporting the claim that job performance, or failure to possess a preferred but unnecessary credential, is appropriately considered at the prima facie stage, and such assertion appears in conflict with 29 C.F.R. § 1620.15(a). Moreover, the evidence before the Court suggests that, consistent with Dr. Verma and Dr. Coan (who both possessed PhDs), Dr. Earl's course load at NSU was teaching "100 and 200 level classes." ECF No. 93.

close call, viewing the evidence in a light most favorable to Plaintiffs as required at this stage in the proceedings, because Defendants have the burden not just of production but of persuasion, the Court finds that Defendants have failed to demonstrate a valid affirmative defense warranting the entry of summary judgment.

### 1. Defendants' Evidence as to Dr. Earl

Defendants advance the following evidence in support of summary judgment: (1) Dr. Earl has an EdD degree in Mathematics education rather than a PhD in Math; (2) "the Ed.D is not typically a research degree and, consequently, is less valuable to a university seeking to expand its research capacity" Schexnider Aff. ¶ 35; (3) "PhD faculty add value to institutions of higher learning and enable them to attract faculty and students who share similar interests and goals," id.; (4) "PhD faculty are highly desirable in strengthening an institution's academic profile and enhancing its ability to attract extra-mural funding," id.; (5) Dr. Earl was hired by NSU in 1991 at a time when salaries were much lower, and Dr. Earl's salary has risen modestly in part because "he lacks a PhD," id. ¶ 16; (6) while Dr. Earl is an established professor at NSU with years of teaching experience, he has failed to become a "Full Professor" based not only on his lack of a terminal degree in Mathematics but based on his ongoing failure to meet the NSU standard of

"exceptional" in either teaching or in scholarship, Deloatch
Aff. ¶¶ 17-18; and (7) Dr. Coan, a non-tenured male associate
professor with a PhD in Math and performing similar duties to
Dr. Earl earned slightly more annually than Dr. Earl
(approximately $1,500 more according to Plaintiffs' salary
chart).

## 2. Defendants' Evidence as to Dr. Coan

Defendants advance the following evidence in support of
summary judgment: (1) Dr. Cohn is an associate professor who
holds a PhD in Math yet he elected to remove himself from the
tenure track at NSU, thereby limiting his opportunity to advance
in academic rank and salary, Schexnider Aff. ¶ 21; (2) Dr. Cohn
was hired as an associate professor in 1999, which was prior to
the hire date of the female professors to whom he compares
himself and the market conditions were different at that time
and were "less favorable to the faculty member," Deloatch Aff. ¶
19; (3) Dr. Coan does not participate in the Virginia Retirement
System, and if he did, he would have been entitled to a one-time
salary increase of 5%, id. ¶ 20;[9] (4) Dr. Verma, one of only two
comparators identified by Dr. Coan, received a salary increase
at the time she was hired because she brought two research

---

[9]  The record, however, appears unclear as to which comparators
participate in the Virginia Retirement System program.

grants with her, Schexnider Aff. ¶ 21;[10] (5) Dr. Coan received poor teaching evaluations which "may have" influenced his salary, id.; and (6) according to Plaintiffs' own evidence, Dr. Coan earned more than three of the six Math Department comparators relied on by Dr. Earl, although he did earn less than the two comparators on which he relies.[11]

### 3. Defendants' Evidence as to both Drs. Earl and Coan

Defendants advance the following evidence in support of summary judgment relevant to the claims of both Dr. Earl and Dr. Coan: (1) "For 15 years, NSU has been repositioning itself to compete in [a] rapidly changing space" and "faculty with the right credentials comes at a premium" and are "in high demand and command competitive compensation," id. ¶ 41; (2) NSU's "recruiting initiatives, in the more recent years, have become more intense as the competition for excellent faculty with comparable and nearby universities heightens" and "[t]his has meant higher starting wages for faculty since, at least, 2002," Deloatch Aff. ¶ 5; (3) When considering the salary of a new

---

[10] Defendant's expert asserts that Dr. Verma's salary increase associated with the grants was $2,000; however, some of the documentation provided by Defendants leaves a less than clear picture regarding Dr. Verma's salary increase as it appears that she was initially offered $47,000, was then offered $49,000, and then finally accepted the third offer of $53,000.  ECF Nos. 75-7, at 12-17.

[11] Neither Dr. Coan nor Defendants endeavor to explain how Dr. Coan's job differs from Dr. Earl or from Dr. Earl's comparator—Drs. Cotwright-Williams, Ellis, Fernando, or Barber.  The salary chart submitted by Plaintiffs indicates that Dr. Coan earns more than Drs. Cotwright-Williams, Fernando, and Barber.  ECF No. 93-1.

teaching faculty hire, NSU considers the following "(a) NSU's Business Needs, (b) Duties and Responsibilities, (c) Performance, (d) Work Experience and Education, (e) Knowledge, Skill, Abilities and Competencies, (f) Training, (g) Certification and Licensure, (h) Internal (the NSU Department) Salary Alignment, (i) Market Availability (at hiring), (j) Prior Salary at the time of Hiring, (k) Total Compensation (factors outside of salary), (l) Budget Implications (at time of hire or salary change) and (m) Long Term Impact (upon Department or upon NSU)," id. ¶ 6; (4) salary disparity may occur when internal salaries for State entities do not keep up with salary inflation in the private sector" and "from 2007 until 2014, no raises were appropriated by the State for internal faculty employees," id. ¶ 30; and (5) NSU is "not alone in dealing with concerns regarding [the] faculty salary compression and inversion" that occurs when newly hired less-experienced professors earn a salary that approaches or exceeds the salary of more experienced faculty, Schexnider Aff. ¶¶ 6-7.

In addition to the above, Defendants provide internal hiring documents associated with the Math Department comparators, and at least some of these documents provide further support for Defendants' affirmative defense. For example, as to Dr. Verma, such documentation appears to demonstrate that Dr. Verma's starting salary at NSU was

determined after negotiations that included reference to the fact that, at the time of her hire, she was earning more than the $47,000 salary NSU initially offered, and that she had secured and/or was pursuing certain grant programs. ECF Nos. 75-7, at 12-17. Defendants also cite to the NSU Teaching Faculty Handbook for the unchallenged proposition that NSU provides merit pay increases "to reward and encourage outstanding professional achievement and productivity." ECF No. 75-10, at 37.

### 4. Plaintiffs' Response

In response to Defendants' summary judgment motion, Plaintiffs begin by making ineffective blanket assertions indicating that Defendants' proposed facts are unsupported, disputed and misleading. Cf. Minnesota Min. & Mfg. Co. v. U. S. Rubber Co., 279 F.2d 409, 415 (4th Cir. 1960) ("[M]ere denials unaccompanied by facts which would be admissible in evidence at a hearing are not sufficient to raise a genuine issue of fact.") (citations omitted). Plaintiffs do, however, thereafter advance some more targeted attacks on Defendants' facts, at least with respect to the Math Department.[12] As argued in Defendants' reply

---

[12] As an example of one of Plaintiffs' effective direct challenges, the Court agrees with Plaintiffs that Defendants' evidentiary submissions do not appear to support the blanket assertion that each and every one of the female hires in the Mathematics department that have been identified as comparators was "an active researcher, with prior teaching experience," ECF No. 76 ¶ 17, although the record surely

brief, Plaintiffs largely fail to comply with Local Rule 56(B), and based on such failure, this Court is permitted to, and does, accept as true the majority of Defendants' factual contentions. That said, while Plaintiffs' filing could be much more clear, it is sufficiently clear from Plaintiffs' opposition brief that both Dr. Earl and Dr. Coan dispute the facts seeking to bolster the qualifications of the female comparators as well as those facts seeking to undercut the qualifications/accomplishments of Drs. Earl and Coan. Such facts are not accepted by the Court as "undisputed."

While factual disputes exist regarding the qualifications of Drs. Earl and Coan and their comparators, similar to the other named Plaintiffs in this case, Dr. Earl and Dr. Coan do not submit deposition testimony, sworn affidavits, an expert report or affidavit, or any other evidence seeking to call into question Defendants' salary compression/market forces argument. Plaintiffs do, however, submit updated (and in Dr. Earl's case, very detailed) resumes documenting their professional achievements in an effort to counter Defendants' version of the facts on this issue. Additionally, Drs. Earl and Coan submit NSU hiring documents associated with four female comparators hired in the NSU Math department between 2009 and 2011. ECF No.

demonstrates that some of the comparators had prior teaching experience and/or a documented record of research.

85-1 to 85-4.[13]   According to Plaintiffs, such documents demonstrate that: (1) each of these comparators was female and replaced a male professor; (2) three of the female professors were selected for hire over a qualified male applicant and were chosen based on a subjective factor; and (3) each selection form includes the "same curious comment" that the female professor that was hired will "serve as a role model for our students."[14] ECF No. 85, at 5.

## 5. Analysis

Considering all of the above, although Plaintiffs' limited evidence renders the issue a close call, the Court finds that entry of summary judgment in Defendants' favor would improperly take the following material issues from the factfinder: (1) the purported "value" that the more recently hired female professors brought to NSU (both at the time of their initial hire and in

[13] Plaintiffs' exhibits indicate that Dr. Earl was one of the NSU faculty members that interviewed each of the four comparators. However, such fact is not material to the Court's ruling on summary judgment as such documents do not reveal Dr. Earl's personal viewpoint as to the qualifications of the applicant, let alone indicate his viewpoint on the appropriate starting salary. Moreover, some of the documentation in the record, when viewed in Plaintiffs' favor, suggests that the salary recommended by the interview panel was less than the starting salary ultimately negotiated by NSU.

[14] In addition to the above, the Court notes that the record contains materials submitted by Defendants documenting Dr. Earl's unsuccessful attempt in 2006 and 2014 to become a full professor. It appears that the latter attempt is subject to an interpretation that favors Dr. Earl as an NSU document before the Court indicates that Dr. Earl "was approved for promotion to the rank of professor by the Mathematics Department Evaluation Committee," but that he was not recommended for promotion by the acting dean. ECF No. 75-6, at 39, 42.

the years to follow) as contrasted with the "value" of Dr. Earl and Dr. Cohn, such issue including consideration of the extent to which "tenure" or PhD status impacts salary in the Math Department at NSU; and (2) the extent to which market factors impacted the salary for Mathematics department hires after 2002.

### a. Value of Professor, including Degree, Tenure

There are material factual disputes as to Dr. Earl and Dr. Coan's purported "value" to NSU, which includes disputed facts regarding their performance, publications, etc. Similarly, there are disputed facts as to the "value" brought by the newly hired female professors, to include their research experience and/or teaching experience. While it is undisputed that Dr. Earl only possessed an EdD and the comparators all possessed a PhD in their terminal field, and it is further undisputed that NSU justifiably places a greater value on a PhD, Defendants fail to effectively monetize such "value," either through direct or circumstantial evidence. Therefore, it is unclear what portion of the salary disparity between Dr. Earl and his comparators is due to such fact.

Similarly, while Dr. Coan formally removed himself from the tenure track, his comparator Dr. Lanz was not tenured until 2015, yet in the years before she achieved tenure, she still earned several thousand dollars more than Dr. Coan. Additionally, while there is no record evidence suggesting that

Dr. Verma "removed herself" from the tenure track, she was hired in 2002 and has still not achieved tenure, yet she continues to earn several thousand dollars more annually than Dr. Coan. Moreover, while Defendants highlight that "tenure carries a salary increase" at NSU when addressing Dr. Coan's claim, Deloatch Aff. ¶ 28, it cannot be overlooked that Dr. Earl has been a <u>tenured</u> <u>associate</u> professor during the entire relevant period and, at least at the time suit was filed, all of his comparators were not tenured, and several of his comparators were only at the level of "assistant professor," a level below "associate professor." ECF No. 75-10, at 29-30. Accordingly, while the Court can and does conclude that it is undisputed that both tenure and possessing a terminal degree are gender-neutral factors that support an increase in salary, the record developed by Defendants lacks sufficient facts that would permit the Court to conclude that Defendants carried their burden of <u>persuasion</u> to demonstrate that the entire pay disparity at issue is explained by such factors.[15]

---

[15] This Court's analysis is not meant to suggest that the issue of "tenure" or "PhD" status is being inconsistently or inappropriately applied at NSU or inappropriately argued by NSU on summary judgement. Rather, the Court's point is that when the record is viewed at this stage in Plaintiffs favor, a fact-finder could compare Drs. Earl and Cohn to the relevant comparators, adjust for their PhD or tenure differences, and still reasonably conclude that NSU has only explained away a portion of the salary differential at issue.

In addition to the above, a review of the salary chart submitted by Plaintiffs and relied on by Dr. Earl and Dr. Coan in support of their summary judgment opposition reveals that Dr. Verma, a female comparator to both Dr. Earl and Dr. Coan, received a substantial raise in 2011 while the salaries of Dr. Earl and Dr. Coan remained the same. While there very well may be a valid gender-neutral basis for such raise (such as Dr. Verma's performance), no such explanation is articulated by Defendants.[16] As previously indicated in a footnote herein, it is notable that Plaintiffs' evidence indicates that Dr. Earl, Dr. Coan and Dr. Verma are all teaching "100 and 200 level classes" within the Mathematics Department. ECF No. 93.

As a final point, Plaintiffs have presented at least some evidence demonstrating that subjective factors may have influenced NSU's recent hiring decisions and/or salaries chosen for the more recently hired female comparators. While relying on subjective factors is surely permissible, it opens the door to the possibility that, when resolving disputes about the credentials of Dr. Earl and/or Dr. Coan, as contrasted with

---

[16] Needless to say, it does not appear that Dr. Verma's 2011 raise could have been based on her PhD or "market conditions" as Dr. Verma had been working at NSU for almost ten years at the time she received such raise. Cf. King, 678 F.3d at 474 (indicating that while "education and experience" could surely explain "some or even all of the difference in the starting salaries" of the relevant employee, "[t]here is no reason why they should explain increases in pay while a person is employed").

disputes regarding some of the less experienced newly hired female comparators, a juror could conclude that gender played a role in the "subjective" salary determination. See Kennedy v. Virginia Polytechnic Inst. & State Univ., 781 F. Supp. 2d 297, 301 (W.D. Va. 2011) (explaining that "[f]inders of fact may consider evidence of the competing experience and qualifications of the male comparators and the plaintiff, their relative salary histories, and the employer's research to determine plaintiff's salary," and concluding that, based on the record in that case, which included evidence indicating that "some degree of subjectivity informed the salary determinations," a reasonable juror could infer that gender played a role in the salary decision) (citing Brinkley, 180 F.3d at 614-15).

### b. Market Forces

As to market factors creating salary compression, while Defendants have advanced sufficient undisputed facts to support the finding that market factors played a part in the increased salaries offered to the comparators as new hires, Defendants again do not effectively quantify the impact of such phenomena. Moreover, while the Defendants' evidence on this issue is not disputed through the presentation of conflicting evidence, in assessing whether Defendants carry their burden of persuasion, the Court notes that Defendants' evidence regarding salary compression is painted with extremely broad strokes, and is not

tied to Mathematics Professors, is not tied to Virginia, or to Hampton Roads, Virginia (other than the acknowledgement that there are multiple colleges in the area, although there were likewise multiple colleges in the area prior to 2002).  Even more glaringly, the analysis presented broadly compares the market "prior to 2002" to the market "after 2002."  Such unbounded comparison that purports to compare a period of at least a decade prior to 2002 with a period of at least a decade after 2002 with no specific explanation whatsoever as to why, or how, conditions changed in 2002, appears to be minimally persuasive at best.  Cf. Wu v. Mississippi State Univ., No. 1:13-CV-00002-DMB, 2014 WL 5799972, at *25 (N.D. Miss. Nov. 7, 2014) (denying summary judgment on a professor's Title VII wage discrimination claim in a case where the defendant relied in part on a university affidavit asserting that salaries for newly hired employees were higher based on "rates that are driven by outside market forces," noting that the "defendant does not even attempt to define the market forces that allegedly influenced the starting salaries" at issue in that case).  Accordingly, while undisputed evidence before the Court indicates that "market factors," accounted for at least a portion of the disparity in salary at issue, Defendants fail to present sufficiently detailed evidence to demonstrate the degree of impact of such forces.

In sum, while Defendants have presented several gender neutral explanations seeking to justify the relevant salary differentials within the NSU Mathematics department, some of which are unchallenged, the Court cannot on this record conclude that Defendants have carried their burden of persuasion to prove that the unchallenged explanations accounted for the entire salary difference. As for the challenged explanations regarding credentials, experience, research proclivity, etc., disputed material facts exist that must be resolved by the factfinder, not the Court. Accordingly "[b]ecause there is a chance, however large or small it might be, that a reasonabl[e] jury could find in Plaintiffs' favor on the EPA claim, summary judgment is improper" as to the claims advanced by Dr. Earl and Dr. Coan. Kennedy, 781 F. Supp. 2d at 301-02.

### G. Blanket Exemption - Productivity System

Defendants alternatively argue that NSU has a "productivity system" for evaluating professors that should warrant a blanket exemption from the Equal Pay Act. While it is undisputed that NSU has several tiers of professors (e.g., assistant, associate, full), as well as a tenure system and a system of evaluation that considers both teaching skills and scholarship, Defendants fail to advance facts, or case law, supporting a finding that NSU's asserted "productivity system" renders Defendants wholly exempt from the EPA. While case law cited by Defendants clearly

41

supports the proposition that "professorial appointments necessarily involve subjective and scholarly judgments, with which [the Fourth Circuit has] been reluctant to interfere," Jiminez v. Mary Washington Coll., 57 F.3d 369, 376 (4th Cir. 1995) (internal quotation marks and citation omitted), such well-deserved caution is applied in the context of analyzing an employment discrimination claim, and does not foreclose such a claim at the outset. Accordingly, summary judgment on this basis is denied.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED** in part, and **DENIED** in part. While the parties may choose to resume settlement discussions with a Magistrate Judge in the wake of this opinion in the limited time remaining before trial, if a final settlement is not reached in the interim, trial will commence as scheduled on Tuesday, March 22, at 10 a.m. as to the Equal Pay Act claims advanced by Dr. Earl, Dr. Coan and Dr. Agyei. Summary judgment is **GRANTED** in favor of Defendants as to the claims advanced by the remaining four Plaintiffs. If the parties wish to resume settlement discussions with Magistrate Judge Krask, they should contact the Magistrate Judge Courtroom Deputies at 757-222-7222.

The Clerk is **DIRECTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

/s/ Mark S. Davis
United States District Judge

March 17, 2016
Norfolk, Virginia